UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
MARTIN SCHOENHALS,                                            ECF CASE

                         Plaintiff,                           Docket No.
                                                              CV 15-2044 (ADS)(ARL)

              -against-

DOWLING COLLEGE CHAPTER, NEW YORK STATE
UNITED TEACHERS, LOCAL # 3890, NEW YORK
STATE UNITED TEACHERS, AFT, AFL-CIO and
DOWLING COLLEGE,

                         Defendants.
------------------------------------------------------------------------X

## DEFENDANT DOWLING COLLEGE'S
## MEMORANDUM OF LAW
## IN SUPPORT OF
## MOTION FOR JUDGMENT ON THE PLEADINGS
## PURSUANT TO FED R. CIV. PROC. RULE 12(c)

Respectfully submitted,

INGERMAN SMITH, L.L.P.
*Attorneys for Defendant*
DOWLING COLLEGE
150 Motor Parkway, Suite 400
Hauppauge, New York 11788
(631) 261-8834

OF COUNSEL
DAVID F. KWEE (DK 1199)

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................................ i,ii

PRELIMINARY STATEMENT ..................................................................................................... 1

STATEMENT OF FACTS .............................................................................................................. 3

ARGUMENT.................................................................................................................................. 12

      **POINT I**

      **THE STANDARD OF REVIEW ON A MOTION FOR JUDGMENT ON
      THE PLEADINGS IS LIMITED TO FACTS STATED ON THE FACE
      OF THE COMPLAINT AND TO MATTERS OF WHICH JUDICIAL
      NOTICE MAY BE TAKEN INCLUDING PLAINTIFF'S MOTION
      BEFORE THE BANKRUPTCY COURT AND INSURER'S COVERAGE
      POSITION AS THE AVAILABLE COVERAGE IS REFERENCED IN
      THE MOTION TO MODIFY THE AUTOMATIC STAY** ........................................ 12

      **POINT II**

      **PLAINTIFF WAIVED ALL RIGHTS TO PURSUE HIS LABOR
      MANAGEMENT RELATIONS ACT AND BREACH OF THE
      COLLECTIVE BARGAINING AGREEMENT CLAIMS IN SEEKING
      RELIEF FROM THE AUTOMATIC STAY BEFORE THE
      BANKRUPTCY COURT** ................................................................................................. 15

CONCLUSION.............................................................................................................................. 17

# TABLE OF AUTHORITIES

## Cases

Allen v. Westpoint-Pepperell, Inc.,
945 F.2d 40 (2d Cir. 1991)............................................................................................ 12

Bell Atl. Corp. v. Twombly,
550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) .......................................... 12,13

Burnette v. Carothers,
192 F.3d 52 (1999) ....................................................................................................... 13

Cerny v. Rayburn,
972 F. Supp. 2d 308 (E.D.N.Y. 2013). ......................................................................... 14

Chambers v. Time Warner, Inc.,
282 F.3d 147 (2d Cir. 2002)......................................................................................... 13

E. 56th Plaza, Inc. v. Abrams,
91 A.D.2d 1129, 458 N.Y.S.2d 953 (1983) ................................................................... 15

Faulkner v. Beer,
463 F.3d 130 (2d Cir.2006)........................................................................................... 13

Hirsch v. Arthur Andersen & Co.,
72 F.3d 1085 (2d Cir.1995)........................................................................................... 13

Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.,
146 F.3d 66, 70 (2d   Cir.1998).................................................................................... 14

Middle East Banking v. State Street Bank Int'l,
821 F.2d 876 (2d Cir.1987)........................................................................................... 15

Roberts v. Babkiewicz,
582 F.3d 418 (2d Cir.2009)........................................................................................... 13

Sheppard v. Beerman,
18 F.3d 147 (2d Cir.1994)............................................................................................. 13

Sure–Snap Corp. v. State St. Bank & Trust Co.,
948 F.2d 869 (2d Cir.1991)........................................................................................... 14

## **Statutes**

U.S.C. § 362 et seq. .............................................................................................................2

## PRELIMINARY STATEMENT

Defendant DOWLING COLLEGE ("DOWLING" or the "COLLEGE") submits the within Memorandum of Law in Support of its Motion to Dismiss the Complaint in its entirety and/or to enforce the Automatic Stay imposed by the Eastern District of New York Bankruptcy Court in effect in the Chapter 11 Bankruptcy pertaining to the Bankruptcy of DOWLING.

Plaintiff had attempted to amend his Complaint to add age discrimination claims against Defendant DOWLING. The Complaint filed in this action pleads a hybrid Duty of Fair Representation ("DFR")/breach of collective bargaining agreement claim under Section 301 of the Labor Management Relations Act ("LMRA").

On November 29, 2016, DOWLING petitioned for Chapter 11 Bankruptcy relief as the COLLEGE's mounting debt and lack of incoming revenue made it impossible to continue its operations as an institution of higher learning. Ironically, Plaintiff accuses DOWLING of discriminating and conspiring against him when the decision to terminate Plaintiff was purely a business decision necessitated by the financial exigency and the possibility of DOWLING going out of business. In particular, the collective bargaining agreement expressly allowed for terminations of faculty on account of financial exigency and to prevent the COLLEGE from having to close its doors, which is why Plaintiff accused his union of conspiring with the COLLEGE. Despite having to terminate Plaintiff to save money, the COLLEGE was in the end still forced to close its doors, thereby, unfortunately for the COLLEGE, and ironically, clearly establishing that the COLLEGE had not only defensible reasons for having to lay-off Plaintiff, but legitimate non-discriminatory reasons, as it was desperately trying not to have to seek Bankruptcy protection.

Plaintiff, in a motion for relief from the Bankruptcy Court's Automatic Stay filed on November 16, 2017, recognizes that the COLLEGE has petitioned for Bankruptcy and sought relief from the Automatic Stay in said motion for the limited purpose of being permitted to pursue his Age

1

Discrimination in Employment Act ("ADEA"), codified at 11. U.S.C. § 362 et seq. (as opposed to his breach of contract claims which continue to be affected by the Automatic Stay). In seeking to lift the Automatic Stay, Plaintiff waived all other claims against the COLLEGE not covered by the COLLEGE's Employment Practices Liability Insurance Policy (the "Policy") inasmuch as only the ADEA claims, in Plaintiff's words, can be "addressed and remedied without any impact on the fund being marshalled by the Trustees in the Bankruptcy matter . . . ." See Exhibit 1, page 3, ¶ 17, Motion Requesting Relief from Automatic Stay.

The Bankruptcy Court granted Plaintiff's Request to modify the Automatic Stay and limit recovery to proceeds of any available insurance, subject to the following conditions: "(a) any recovery by the Movant in the Action against the Debtor-[COLLEGE], or any entity or person that may have an indemnification claim against the Debtor, shall be limited solely to any available insurance coverage of the Debtor; (b) [Plaintiff-]Movant waives and release any and all claims solely as against Debtor's bankruptcy estate; provided however this shall in no way be deemed or construed as a waiver and/or release of the Movant's rights to pursue and recover damages awarded in connection with the Action from any applicable insurance policies maintained by the Debtor; . . . ." See Exhibit 4, page 2, ¶ 2, Order Granting Request to Modify Automatic Stay and Limit Recovery to Proceeds of Available Insurance. Pursuant to this Order, in other words, not only does the prohibition on execution, enforcement or collection of any judgment against DOWLING remain in full force and effect, but Plaintiff has waived and released any and all claims that are asserted solely as against the Debtor's bankruptcy estate and that does not involve insurance.

By virtue of the foregoing reasons, therefore, inasmuch as this Court's March 20, 2019 Order denied Plaintiff's Motion to Amend to add ADEA and State law age discrimination claims - meaning that this action remains a breach of contract action only – DOWLING's Motion for Judgment on the Pleadings, dismissing the Complaint, should be granted in its entirety.

2

## STATEMENT OF FACTS

DOWLING COLLEGE has, since July of 2016, ceased all operations and terminating all faculty members, facilities personnel, staff and administrators. The COLLEGE was, in the not so recent past, at one time, a private institution of higher learning located in Oakdale, New York; with a satellite campus, located adjacent to the Brookhaven Airport where DOWLING's school of aviation is situated; and a third branch at the Melville Center, located in Melville, New York.

Shortly before closing, about 2,000 full and part-time undergraduate and graduate students were attending one of DOWLING's four schools: the School of Education; School of Arts & Sciences; Townsend School of Business; and the School of Aviation.

DOWLING's accreditor, the Middle States Commission on Higher Education, on August 31, 2016, withdrew its accreditation of DOWLING. Although Plaintiff continues to dispute that financial exigencies facing the COLLEGE were a factor in his termination, Middle States had already begun moving toward withdrawing its accreditation during the time that it had been decided to terminate Plaintiff. Withdrawal of accreditation for DOWLING meant the end of its higher education operations as DOWLING expected many of its students to leave the COLLEGE if it was unable to award accredited degrees. Middle States found that due to the financial problems and the severe decline in enrollment and other factors outside of DOWLING's control, that the viability and effectiveness of the education at DOWLING was so compromised that it had no choice but to withdraw its accreditation credentials.

As a private non-profit educational institution, tuition paid by DOWLING's students represented approximately 96 percent of the COLLEGE's revenue. Without accreditation, the COLLEGE lost its primary source of revenue and would have no choice but to close its doors. DOWLING's endowment had shrunk to about $2 million, from approximately $11 million only a decade ago. Stagnation in the elementary and secondary education job market had also resulted in

3

reduced enrollment at the School of Education; preparing students for teaching professions represented a significant source of revenue for DOWLING.

Due to the plummeting enrollment as well as the well-publicized economic recession toward the end of the last decade, DOWLING had already been operating on a year-to-year basis prior to its eventual closing in the Summer of 2016. As recently as 2009, DOWLING had approximately 5,700 total students. DOWLING began the fall of 2014 with only 2000 students. Nevertheless, through a combination of buyouts and layoffs, savings had been realized by eliminating 26 faculty jobs, leaving DOWLING with about 51 full-time faculty to teach its 2,000 students. In addition, from 2009 to 2014, DOWLING had implemented reductions in force in non-faculty bargaining units. By way of example, Administrative / non-aligned staff were reduced by 126 positions, Local 153 Clerical positions were reduced by 50, and Local 30 / 434 maintenance and operations positions were reduced by 19 in that time frame. In 2012 and, again in 2014, DOWLING has had to reopen negotiations with labor bargaining unit and codefendant DOWLING COLLEGE CHAPTER NEW YORK STATE UNITED TEACHERS, LOCAL # 3890 (the "UNION") (who has since been dismissed from the action, by virtue of a settlement with Plaintiff) in order to stave off more drastic layoffs and to keep DOWLING financially solvent. DOWLING had at one point realized improved savings, and such savings and the resulting, albeit, temporary survival of DOWLING could not have been realized, without reopening the faculty collective bargaining agreements and providing for terminations of faculty due to financial exigency. Both the 2012 and 2014 agreements clearly state that financial exigency had compelled some of the terms in the Memoranda of Agreement that resulted from reopening negotiations in 2012 and 2014.

Plaintiff MARTIN SCHOENHALS, has refused to recognize that the reality of the COLLEGE's dire financial situation, was what caused his termination, by continuing to maintain allegations of conspiracy (and attempting to add discrimination claims to his Complaint); that the

COLLEGE and the UNION conspired to permit lay-offs based on financial exigency in order to terminate Plaintiff.   See "Exhibit A," the Complaint dated April 15, 2015, attached as part of Exhibit 1, Plaintiff's Motion for Relief from an Automatic Stay, dated November 15, 2017.  As a one-time member of the full-time faculty at DOWLING, Plaintiff has been represented by the UNION, a local affiliate of codefendant NEW YORK STATE UNITED TEACHERS ("NYSUT") (who has also been removed from this litigation due to a settlement with Plaintiff).

The reality was, always, that by the 2013-2014 academic year, it became clear to both DOWLING and the UNION that certain financial exigencies existed; financial exigencies within the meaning of the agreement negotiated between DOWLING and the UNION.  The parties mutually agreed that it was fiscally prudent to engage in negotiations regarding the implementation of structural changes in the full-time faculty workforce to reflect the economic realities of DOWLING's enrollment and revenue. The financial data setting forth the financial exigencies that necessitated this negotiated action was provided to, and verified not only by the Faculty Executive and Negotiating Committees of the UNION, but by an independent outside auditing firm retained by the UNION. The arms-length negotiations between the College and the Faculty Chapter throughout year 2014 culminated in a contractual agreement dated November 7, 2014.  See Exhibit 2, original Faculty Agreement and Memorandum of Agreement of 2012, and Exhibit 3, Memorandum of Agreement of November 7, 2014.  Both these exhibits are referenced extensively throughout the Complaint and should therefore be incorporated into the pleadings as if they were part of the pleadings.

Plaintiff's discontent with the respective collective bargaining agreements notwithstanding, each of the actions described in Plaintiff's Complaint were voted upon and approved by the membership of his UNION, effectively binding Plaintiff, a member of the UNION, to its negotiated provisions.

The negotiated agreement sets forth with great specificity the agreed upon mechanism by which certain savings would be reached, while at the same time still allowing the COLLEGE to fulfill the needs of its students both present and future, its academic mission and its accreditation responsibilities.

The concept of first offering early retirement incentive plan ("ERIP") opportunities to eligible classes of employees before making a determination to implement reductions by other means was a negotiating proposal made by the UNION on behalf of its membership, and accepted by the COLLEGE in furtherance of an overall negotiated solution.   The duly authorized representatives of the UNION negotiated the agreement and participated in the decision making regarding its implementation, and the terms of the agreement were voted on and overwhelmingly approved by the Chapter membership.  See Exhibit 3.  The November 7, 2014 agreement envisioned that anticipated voluntary resignations occasioned by the offer of an ERIP to eligible employees would reduce the need for terminations.  Notwithstanding that, even after certain members of the faculty had chosen to accept an ERIP, DOWLING still had to terminate faculty members in order to realize more savings.

It is this contractually agreed-upon scheme of terminating faculty members, including the eventual termination of Plaintiff, that became the subject of this action.

Although Plaintiff was eligible to elect an ERIP option set forth in the November 7, 2014 agreement, he did not elect to do so.  This lead to the COLLEGE engaging in an analysis as set forth in the collective bargaining agreements, that then led to the eventual decision to eliminate Plaintiff's position and the Anthropology Department as a whole.

The framework and criteria used for cuts were negotiated between the UNION and COLLEGE administration as a part of the collective bargaining process.  It is this framework that Plaintiff now disagrees with notwithstanding the fact that both his UNION and the COLLEGE

6

agreed to these cuts and incorporated this framework into an amendment to the collective bargaining agreement. Once decided upon, an administrative team set about applying the methodology to the faculty. Chapter representatives consulted with the Administration representatives and approved the methodology to determine which positions would be reduced in the best interests of the College. The methodology was applied in consideration of all positions reduced, not just Plaintiff's.

Though enrollment data and patterns were the primary tool used to identify potential cuts, the administration's decision-making process was also deeply influenced by considerations of how best to maintain the overall academic integrity of the COLLEGE and uphold its mission. The reduction in force had to be deep, but the administration (in consultation with the UNION) had to ensure that all essential academic programs and services could be maintained.

Upon reviewing the relevant data, it became clear that the COLLEGE would need to eliminate the Department of Anthropology and all of the majors that it served. Plaintiff was a professor of Anthropology at the College, along with one other professor who had already indicated his intention to depart from the College. In the Fall of 2014, Anthropology taught a total number of approximately 79 students. Plaintiff taught 34 of those. Anthropology had five majors and a ratio of merely 2.5 undergraduate majors for each Full Time Faculty member. These numbers were simply unsustainable for a private college in the 2014 economic climate.

While the COLLEGE would need to eliminate the Anthropology Department and the majors that it served, it could not simply eliminate multiple programs in the Arts and Sciences, even if several of those other areas had low enrollment, and still be true to the mission of being a comprehensive college with a liberal arts tradition. Striking this balance caused instances where cuts needed to be made in areas with greater enrollments. This effect is dramatically evident in the psychology department, where 2 of the 6 faculty were identified for separation even though Psychology was a thriving and profitable area.

7

In the Fall of 2014, the Psychology Department taught a total of 616 students, had 144.5 majors and a ratio of 24:1 undergraduate majors to Full Time Faculty, among the strongest enrollment at the College. The two Professors of Psychology who were reduced taught 105 and 80 students respectively, as compared to Plaintiff's 34 students. Yet the cuts described above were made to staffing in that department in order to preserve minimal staffing in other areas that were struggling, but deemed to be critical to the college and its mission of providing a comprehensive liberal arts education.

Similarly, the Management and Leadership section of the School of Business was reduced by 2 positions from 6 to 4 in the interests of maintaining overall balance despite comparably strong enrollment data. That section serviced 241 undergraduate majors in the Fall of 2014, along with 280 graduate majors. The total students taught were 1,272 and the department had a ratio of 40:1 undergraduate majors to Full Time Faculty.

It should be noted that many faculty sustain healthy enrollments in classes without having many majors. In some cases (economics/chemistry) it is because those subject areas play a vital service role in other majors (economics is required of all business majors, while chemistry is required in the environmental science and biology areas, both with more robust enrollment numbers). In other cases a particular subject area has a presence in DOWLING's core curriculum. The core curriculum is broken into broad subject areas, and all DOWLING students need to take two courses from a large laundry list in each area. Since core classes are a requirement that could be fulfilled by other subject areas in a grouping, a subject area whose student body came primarily through core was seen as less essential than those who were primarily teaching majors. In sum, maintaining the COLLEGE's ability to service the core and uphold academic integrity is not dependent on any single department. For instance, students were required to take classes in either

anthropology or psychology, and a reduced anthropology presence does not prevent students from fulfilling that obligation via psychology.

An additional consideration was the future academic vision for the college. What role do these programs play in DOWLING's plans for future offerings, and/or what is the likelihood of increasing student demand for that area? In light of the economic challenges faced and the unfortunate necessity for reductions, the COLLEGE was confronted with making difficult choices, and Anthropology was not recognized to be a program that fit within that vision for the future.

The four departments with the lowest number of majors in the school as of the Fall 2014 were Chemistry (8 majors), Anthropology (5 majors), Music (4 majors), and Philosophy (3 majors).

Chemistry played a vital role in the Biology and Environmental Science majors, two of the healthiest programs at DOWLING's School of Arts and Sciences. The COLLEGE was at the time also contemplating an increase in its emphasis on STEM ("Science, Technology, Engineering, and Math") education as it was anticipated that STEM could generate more tuition revenue. As such, a Chemistry department plays a potentially vital role. Chemistry was also a department of one, so any faculty cuts there would have left no full time faculty member in Chemistry and would have therefore eliminated that whole department.

Music has a robust presence in the context of DOWLING students meeting their core requirements. The presence of music at DOWLING was deemed essential given the COLLEGE's identity as a liberal arts college. DOWLING admissions recruiters had also come back with strong student interest in expressive arts therapy (music therapy, art therapy, etc….), and were developing that program. There were two music professors, but since one took the voluntary ERIP, cutting the other would have meant that no full time faculty would remain in music.

Philosophy, like music, had existed as an integral part of DOWLING's core curriculum requirements. However, Philosophy also provided the ethics courses for a minor in Bio Ethics, a

highly recommended minor for all students pursuing health and allied fields. Moreover, the Criminal Justice program, one of DOWLING's fastest-growing majors in 2014, also had an ethics component. Finally, Philosophy plays a role in many of the new degree programs the school was building (such as Health Studies and Sustainability Studies). As DOWLING's strategic vision at the time placed an increased emphasis on skills training, the administration anticipated a role of increasing importance for the philosophy department. Training in ethical and critical thinking was deemed an absolutely vital part of the college's core mission, and as such, the administration chose to maintain this department. There were two philosophy professors, but one took the voluntary ERIP, so separating the other would have meant that no full time faculty would remain in that department.

Anthropology is part of the Sociology/Anthropology major, as well as the core. As previously discussed, the core presence of Anthropology accounts for much of its enrollment, but this was deemed to be a secondary factor. The core, though critical to the college, does not depend on the presence of Anthropology. There were other options available to students for fulfilling the core requirement other than Anthropology, and the College could clearly fulfill its stated mission in the absence of an Anthropology department.

Unlike Philosophy, Chemistry, and Music, Anthropology did not have a stand-alone major, but instead played a minority role in a blended major (Sociology/Anthropology). The Sociology/Anthropology major had two tracks. One was the standard Sociology/Anthropology track; the other was a Social Work track. The Social Work track required students to take 18 required credits of sociology/social work, 3 required credits of Anthropology, and 12 credits of either Sociology and/or Anthropology. DOWLING undertook a careful analysis of the transcript of every Soc/Anthro Social Work major and found that the overwhelming majority of elective credits took place in Sociology. Any Anthropology credits from this track were negligible.

The Sociology/Anthropology major required 15 credits in Anthropology and 18 credits in sociology. For purposes of the analysis of the Department, those students were split equally between the two areas. At the end of the analysis, DOWLING concluded that Anthropology could count 5 majors. Since DOWLING also offers a Sociology major, the social work track could be seamlessly moved to the Sociology major enabling the College to teach out any of its existing students, and only offer Sociology in the future. Given the depth of the required reductions, Anthropology was not deemed to be an essential part of DOWLING's liberal arts mission. Sociology could reproduce many of the benefits, and the handful of courses they would need to offer going forward (estimates call for 2-3 a semester) could not sustain a full time faculty line.

As a result, Plaintiff's Anthropology department was terminated, and oversight for those classes fell under Sociology (which also administers Gerontology and Social Work). It is worth noting that Nassau Community College does not offer an Anthropology major, nor do other private colleges in the area, such as St. Joseph's College and Molloy College.

The ironic and cruel twist of fate, of course, is that DOWLING has gone from a private college in dire financial straits, to a college that has ceased operations altogether, and merely exists as a bankruptcy estate in order to wind down its affairs. Ironic and cruel because part of Plaintiff's claim was premised on the notion that DOWLING did not need to terminate Plaintiff; that Plaintiff was not entirely convinced of the financial exigency facing the College in 2014 but believed the UNION had conspired with administration to terminate him by renegotiating its collective bargaining agreement relative to lay-offs.

Termination was entirely consistent with the UNION's and the COLLEGE's collective bargaining agreement and its interests and attempts to save the COLLEGE from overwhelming financial ruin that the COLLEGE was facing when Plaintiff was terminated. The reality of DOWLING's financial problems is what necessitated renegotiations and, regretfully, Plaintiff's

11

termination. DOWLING closing its doors has unwittingly, but dramatically, rebutted Plaintiff's accusations that financial exigency was, Plaintiff will have this Court believe, unsupported by facts. Contrary to Plaintiff's unprincipled accusations of there being a conspiracy between COLLEGE administration and UNION officers, renegotiations to realize savings were clearly essential for the survival of the COLLEGE and now show that the reality of the COLLEGE's financial problems were not just legitimate reasons for Plaintiff's termination, but were absolutely essential to the COLLEGE's survival even if, in the end, it was not to be.

## ARGUMENT

**I.     THE STANDARD OF REVIEW ON A MOTION FOR JUDGMENT ON THE PLEADINGS IS LIMITED TO FACTS STATED ON THE FACE OF THE COMPLAINT AND TO MATTERS OF WHICH JUDICIAL NOTICE MAY BE TAKEN INCLUDING PLAINTIFF'S MOTION BEFORE THE BANKRUPTCY COURT AND INSURER'S COVERAGE POSITION AS THE AVAILABLE COVERAGE IS REFERENCED IN THE MOTION TO MODIFY THE AUTOMATIC STAY**

In deciding a motion to dismiss, pursuant to Rule 12(b)(6), consideration is limited to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken. Allen v. Westpoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991).

Despite the fact that all reasonable inferences are to be drawn in favor of the plaintiff-non-movant, a plaintiff is still required to state a right to relief in his or her complaint: a Plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact). Bell Atl. Corp. v.

12

Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964-65. 167 L.Ed.2d 929 (2007).   Furthermore, "[c]onclusory allegations of the legal status of the defendants' acts need not be accepted as true for the purposes of ruling on a motion to dismiss." Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1092 (2d Cir.1995); see also Burnette v. Carothers, 192 F.3d 52, 56 (1999), cert. denied, 531 U.S. 1052, 121 S.Ct. 657, 148 L.Ed.2d 560 (2000).

Federal Rules of Civil Procedure Rule 12(c), titled "Motion for Judgment on the Pleadings," entitles such a motion to be served "[a]fter the pleadings are closed--but early enough not to delay trial . . . ."   Furthermore, a party is specifically entitled to raise the failure to state a claim defense through a motion under Rule 12(c), pursuant to Rule 12(h)(2), and does not waive that defense even if the party chose not to move to dismiss but to serve responsive pleadings first under Rule 12(h)(1). The standards applicable to a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) therefore also apply to Rule 12(c) motions for judgment on the pleadings.   See Sheppard v. Beerman, 18 F.3d 147, 150 (2d Cir.1994).

While Rule 12(b)(6) and 12(c) motions typically involve an examination of only the pleadings and any documents attached to such pleadings, a court should also consider documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147 (2d Cir. 2002) (quote ""[e]ven where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint."); see also Faulkner v Beer, 463 F.3d 130, 134 (2d Cir.2006).   Thus, on a 12(c) motion, the court considers "the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." Roberts v. Babkiewicz, 582 F.3d 418, 419 (2d Cir.2009).

This Court has accepted the notion that judicial notice should be taken of publicly available and relevant filings in related bankruptcy litigation in deciding Rule 12 motions. See 13 Sure–Snap Corp. v. State St. Bank & Trust Co., 948 F.2d 869, 872 (2d Cir.1991) (taking judicial notice of bankruptcy court findings to determine their preclusive effect); see also Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc., 146 F.3d 66, 70 (2d Cir.11998); ("Judicial notice may encompass the status of other lawsuits, including [those] in other courts, and the substance of papers filed in those actions."); see generally Cerny v. Rayburn, 972 F. Supp. 2d 308, 312 (E.D.N.Y. 2013).

As a preliminary matter, therefore, it is entirely appropriate for this Court to consider not only the Motion for Relief from an Automatic Stay, dated November 15, 2017 (including all exhibits attached thereto and filed with the Bankruptcy Court), but also Exhibits 2 and 3, the original Faculty Agreement and Memorandum of Agreement of 2012, and the Memorandum of Agreement of November 7, 2014, as both these exhibits are referenced extensively throughout the Complaint. Judicial notice should also be take of the insurer's coverage position denying coverage for all claims set forth in the original Complaint, attached as Exhibit 6, as the Motion to Modify Automatic Stay and the resulting Order limiting Plaintiff's prosecutable claims to claims for which there is coverage from insurance (all claims related to the collective bargaining dispute and labor grievances are excluded from coverage and are therefore, presumably, claims against what is now DOWLING's bankruptcy estate) relies on the position taken in Exhibit 6, which is why Plaintiff moved to lift the stay in the first place, believing that because the proceeds on a discrimination claim would come from insurance (and not the bankruptcy estate), that he would limit his live claims to his proposed discrimination claims. As Plaintiff's action, at least as set forth in the Complaint, alleges, in essence, a breach of the Collective Bargaining Agreement and involves the ERIP Memorandum of Agreement, these documents constitute documents relied on in bringing the suit of which judicial notice should also be taken.

14

By virtue of the requests set forth in the Bankruptcy Court Motion; the Order in Exhibit 4 that resulted from Plaintiff's Motion in which the Bankruptcy Court found that Plaintiff waives all other claims against the COLLEGE's bankruptcy estate other than the age discrimination claims to the extent covered by insurance; the Complaint; the Order denying Plaintiff leave to amend the Complaint to add age discrimination claims (Exhibit 5), and the insurer's position that the Complaint which is the subject of this action is not covered by insurance (Exhibit 6), it is respectfully requested that this Court grant this Motion on grounds that Plaintiff has waived his right to litigate all of the claims asserted in the Complaint.

> **II.     PLAINTIFF WAIVED ALL RIGHTS TO PURSUE HIS LABOR MANAGEMENT RELATIONS ACT AND BREACH OF THE COLLECTIVE BARGAINING AGREEMENT CLAIMS IN SEEKING RELIEF FROM THE AUTOMATIC STAY BEFORE THE BANKRUPTCY COURT**

Waiver is "the intentional relinquishment of a known right." E. 56th Plaza, Inc. v. Abrams, 91 A.D.2d 1129, 458 N.Y.S.2d 953. 955 (1983). If a party clearly waives its right to pursue a cause of action, that waiver will be binding in future actions absent exceptional circumstances. See Middle East Banking v. State Street Bank Int'l, 821 F.2d 876, 906 (2d Cir.1987) (upholding validity of release despite claim of unilateral mistake). Intent must be "clearly established and cannot be inferred from doubtful or equivocal acts or language." E. 56th Plaza, 458 N.Y.S.2d at 955.

Plaintiff's intent to relinquish all of his rights in any claims not covered by insurance is clear, inasmuch as Plaintiff was aware at the time the Motion in Exhibit 1 was filed, that recovery would be limited to "any available insurance coverage of the Debtor" and that by including a copy of the insurance policy to his Motion, as Exhibit G (Exhibit G was attached to the Motion annexed hereto as Exhibit 1), he intended to convey to the Bankruptcy Court that he would only be intending on seeking to lift the Automatic Stay to the extent that he was seeking recovery from the proceeds of the

15

insurance policy which purported to cover only the proposed ADEA and State law age discrimination claims portion of his claims.

By extension, inasmuch as the Bankruptcy Court Order, of which judicial notice is to be taken, references the actual policy and available insurance coverage, judicial notice must also be taken of the insurer's letter of June 5, 2015 which, in referencing the policy, excludes all claims alleged in the Complaint from coverage. As a result, the Bankruptcy Court did permit Plaintiff to lift the stay subject to Plaintiff limiting his pursuit of damages to insurance covered claims. When this Court denied Plaintiff leave to amend and add the ADEA and State law age discrimination claims to the Complaint, in an Order of this Court dated March 20, 2019, the Plaintiff was left with nothing to litigate for not only are the claims in the original Complaint in this action subject to the Automatic Stay, but the Bankruptcy Court Order lifting the stay entered on January 24, 2018 conditions the granting of the Motion to Modify Automatic Stay on Plaintiff's waiver and release of any and all claims solely as against Debtor's bankruptcy estate. Specifically, the Bankruptcy Court Order provides that "Movant waives and release any and all claims solely as against Debtor's bankruptcy estate . . . . " See Exhibit 5, page 2, ¶ 2. Since the insurer's position is that the claims set forth in the Complaint involve labor disputes and matters involving grievances with respect to the collective bargaining agreement, and are therefore excludable from coverage, the Complaint, as it stands, only asserts the now-waived claims against DOWLING's bankruptcy estate.

By virtue of the foregoing, therefore, it is respectfully requested that this Court grant this Motion in its entirety by dismissing the Complaint as Plaintiff has waived all claims not covered by insurance, and/or ordering and declaring that the Automatic Stay continues inasmuch as Plaintiff's claims involve only claims against the COLLEGE's bankruptcy estate, and not the insurance proceeds as the insurance policy in question only purports to offer coverage for employment discrimination claims and not employment breach of contract claims.

16

## CONCLUSION

Based on the foregoing, it is respectfully requested that this Court grant Defendant DOWLING COLLEGE's Motion for Judgment on the Pleadings, dismissing Plaintiff's Complaint in its entirety as Plaintiff has clearly and knowingly waived all claims against the COLLEGE's bankruptcy estate, through Plaintiff's counsel's motion, in an effort to pursue only the insurance proceeds purportedly covering Plaintiff's alleged discrimination claims, and for such other and further relief as this Court may deem just and proper, including a declaration that the Automatic Stay remains in place as the Bankruptcy case involving DOWLING COLLEGE remains pending as of the date hereof.

Dated:     Hauppauge, New York
           April 15, 2019

                            Yours, etc.
                            INGERMAN SMITH, L.L.P.
                            *Attorneys for the Defendant DOWLING COLLEGE*

                        By: *S/David F. Kwee*
                            DAVID F. KWEE, ESQ. (DK 1199)
                            150 Motor Parkway, Suite 400
                            Hauppauge, New York 11788
                            (631) 261-8834
                            dkwee@ingermansmith.com